**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3316-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

TYRELL JACKSON, a/k/a
TYRELL T. JACKSON,

    Defendant-Appellant.

_____

Submitted December 2, 2025 – Decided March 20, 2026

Before Judges Gooden Brown and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 10-04-0439.

Jennifer N. Sellitti, Public Defender, attorney for appellant (John V. Molitor, Designated Counsel, on the brief).

William A. Daniel, Union County Prosecutor, attorney for respondent (Milton S. Leibowitz, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

This case returns to us following an evidentiary hearing on defendant Tyrell Jackson's post-conviction relief (PCR) petition. In his petition, defendant raised ineffective assistance of counsel (IAC) claims in connection with trial counsel's failure to investigate three alibi witnesses—Brandon King, Reginald Cooke, and Robert Levine. The petition followed defendant's 2011 convictions for murder and related weapons offenses stemming from the fatal shooting of a drug-dealing associate, Dana Reid, on Madison Avenue in Elizabeth in the early morning hours of May 9, 2005.

On direct appeal, in an unpublished opinion, we affirmed the convictions and aggregate forty-eight-year prison sentence, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. State v. Jackson, No. A-2372-11 (App. Div. Sept. 12, 2016). Our Supreme Court denied certification. State v. Jackson, 230 N.J. 556 (2017). In the ensuing appeal from the trial court's denial of defendant's PCR petition, in an unpublished opinion, we affirmed in part, but reversed and remanded for an evidentiary hearing to address the proposed alibi witnesses, reasoning:

> [T]he PCR judge summarily rejected the alibi witnesses' affidavits as lacking credibility. However, "[a]ssessment of credibility is the kind of determination 'best made through an evidentiary proceeding with all its explorative benefits, including the truth-revealing power which the opportunity to cross-examine

bestows.'" State v. Porter, 216 N.J. 343, 347 (2013) (quoting State v. Pyatt, 316 N.J. Super. 46, 51 (App. Div. 1998)). Because the judge incorrectly made credibility determinations without first conducting an evidentiary hearing, we are constrained to reverse and remand for an evidentiary hearing on defendant's claim that trial counsel rendered ineffective assistance by failing to investigate and call Cook[e], King, and [Levine] as alibi witnesses. On remand, the judge should make "a qualitative judgment as to whether that evidence, after being subjected to cross-examination, is sufficient to engender a reasonable probability that the result of the [trial] would have been different" if it had been presented. State v. Russo, 333 N.J. Super. 119, 140 (App. Div. 2000).

[State v. Jackson, No. A-1652-20 (App. Div. Aug. 11, 2023) (slip op. at 21) (second and fifth alterations in original) (citations reformatted).]

After conducting an evidentiary hearing, the PCR judge issued an order and written opinion on May 9, 2024, denying defendant's petition and concluding defendant failed to establish IAC. Defendant now appeals from the May 9, 2024 order, raising the following points for our consideration:

POINT I

THE PCR JUDGE'S FACTUAL FINDINGS WERE "CLEARLY MISTAKEN" AND "SO WIDE OF THE MARK" THAT THE "INTERESTS OF JUSTICE REQUIRE APPELLATE INTERVENTION."

POINT II

3

THE DEFENDANT ESTABLISHED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE EVIDENTIARY HEARING BASED UPON THE TESTIMONY OF THREE ALIBI WITNESSES.

Having considered the record developed at the evidentiary hearing and the applicable legal principles, we disagree and affirm.

I.

We need not recount the extensive proofs adduced at defendant's jury trial as they were exhaustively detailed in our prior unpublished opinions. Suffice it to say, defendant was engaged in a drug-dealing operation led by codefendant, Dwayne Dricketts, and killed Reid at Dricketts's behest after Reid failed to pay for drugs Dricketts had given him to sell.[1] Reid's girlfriend was an eyewitness to the shooting and, at trial, identified defendant as the shooter with 100% certainty. Another drug-dealing associate observed defendant and Dricketts running from the area around the time of the shooting and testified Dricketts later told him defendant had shot Reid.

In his PCR petition, defendant asserted he was denied effective assistance of counsel because counsel never investigated or produced three alibi witnesses

---

[1] Codefendant Dricketts was also convicted of the same offenses in a subsequent jury trial, and his convictions were also affirmed on direct appeal. State v. Dricketts, No. A-3677-13 (App. Div. Apr. 18, 2018), certif. denied, 236 N.J. 20 (2018).

who would have testified he was with them at a motel from the evening of May 8 until the morning of May 9, 2005, when the murder occurred. Defendant submitted an undated witness list he purportedly provided to his attorney prior to trial that included King's and Cooke's names but not Levine's. William Vogel, defendant's investigator, interviewed all three witnesses in 2018 and prepared investigative reports that were submitted to support defendant's petition. Additionally, defendant submitted certifications[2] prepared by King, Cooke, and Levine.

On remand, the PCR judge conducted an evidentiary hearing on December 8, 2023, during which King, Cooke, Levine, and defendant testified. Sadly, defendant's trial attorney had passed away.

King, who was then serving an unrelated murder sentence, confirmed the accuracy of his May 25, 2020 affidavit. He testified he and defendant were "good friends" and saw each other "probably daily" between 2003 and 2005. He confirmed that on the day prior to the murder, he was driving back and forth between Elizabeth and New York City with defendant in a red car.

---

[2] We refer to certifications and affidavits interchangeably.

A-3316-23

King further testified on the day of the murder, he was selling drugs with defendant at a motel, but took breaks from selling drugs at noon and midnight. He claimed Elizabeth "shut down" around midnight, so there was no market to sell drugs. Although King could not recall the name of the motel when he was interviewed by Vogel, during his testimony, King "believe[d] it was the Econo Lodge" on "[Routes] 1 and 9 by the airport."

King testified he, defendant, and "another guy" were "chilling" and "hanging out smoking" at the motel but could not "recall the exact name of who else was there." Although King initially testified he found out about the shooting from "phone calls" telling him and defendant not to "come out" of the motel, he later stated he "heard the gunshots" while at the motel on a "lunch break" from his drug sales.

When asked why he did not reach out about testifying at the trial, King stated it "would have been impossible" because he had not "seen [defendant] since 2005" and he "didn't know who his lawyer was or . . . how to contact him." King said if he had been called to testify, he would have done so consistently with his affidavit and his testimony at the evidentiary hearing.

Cooke, who was then serving a sex trafficking sentence, confirmed the accuracy of his September 18, 2018 certification. He stated defendant was "like

6

[his] big brother" and testified he was with defendant at the "hotel . . . right next to the [f]ight [c]lub" "on [Routes] 1 and 9" from around May 1 to 12, 2005. He said they were "hanging out," "meeting girls," and "smoking." Cooke remembered several people "hanging out" with them during this period, including King and Dricketts.

Cooke stated he did not even find out about the shooting until "five years later" when defendant was "arrested . . . in front of [Cooke's] house." He claimed he learned the date of the shooting through "Lexis" and "read[ing] about the trial." He said he had never been contacted to testify at defendant's trial and would have done so consistently with his testimony at the evidentiary hearing. He acknowledged it was "irresponsible of [him]" to not reach out to defendant's lawyer.

Levine confirmed his June 5, 2020 affidavit was accurate. He stated he and defendant were friends since primary school and "h[ung] out together all of the time." Although Levine could not recall what dates he arrived at or left Elizabeth, he testified he came in the "beginning of May" and "stayed for about two weeks" to sell drugs. During that time, Levine was "in a hotel" with defendant, King, and others, totaling "around eight or nine" people in two or three hotel rooms. Levine stated they "never went out during the day" to sell

7

drugs but sold drugs at the gas station from midnight until "the sun c[a]me up." He also said the group "walked everywhere" and "didn't have a car."

Levine testified on the morning of May 8, 2005, the day before the shooting, defendant and King accompanied him to the barbershop.[3] Afterwards, they returned to the motel to drink, smoke, and hang out for the rest of the day. Between 9:00 p.m. and midnight, Levine recalled someone coming to the room saying, "somebody had got shot," but he did not hear gunshots. He said after receiving word of the shooting, everyone "stay[ed] in the room."

Levine testified he left for New York City on the afternoon of May 9, 2005, because he had a court date in New York on May 11. He stated he did not know defendant was incarcerated for the 2005 shooting until he was contacted by Vogel in 2018. Although he spoke with defendant and his attorney in 2015 and 2016, respectively, he did not learn the "details of what [defendant] was locked up for" at that time because the conversations were on a recorded prison phone line. Levine stated he would have testified at defendant's trial consistently with his testimony at the evidentiary hearing if he had been contacted.

---

[3] According to Levine, another individual known to him by the name "Abu" was with them. Despite naming Cooke in his affidavit, Levine did not know whether Abu was Cooke.

Defendant testified about his discussions with his attorney regarding the alibi witnesses, his providing witness lists to trial counsel, and his whereabouts when the shooting occurred. Defendant confirmed the truth of his certification, stating his attorney "never interviewed any of the people that were with [him] at the time" of the shooting despite defendant "ask[ing] that he investigate" defendant's alibi defense. Defendant stated he met with trial counsel "three or four" times before trial and discussed the "possibility of an alibi" defense. Specifically, defendant told counsel when they met in prison that "[he] was with several people in a hotel room when th[e] crime happened." According to defendant, he gave counsel "several letters" containing alibi witnesses to call.

Two of the letters were introduced at the evidentiary hearing as an exhibit. The letters, which were undated, were handwritten on paper with a Union County Jail letterhead and contained twenty-three separate names of "witnesses," some with contact information. One page listed nine names, including Cooke's and King's, with "Alibis please contact" written next to each. At the top of each page was the word "Investigator." Defendant claimed he wrote the letters while incarcerated so that his attorney could locate the people listed. However, according to defendant, his attorney "didn't send no investigator to talk to these witnesses." Defendant acknowledged he did not put

Levine's name on the letters but claimed he had done so in other communications.

Defendant said, when questioned about the alibi witnesses, his attorney always responded the same way, indicating that "calling [the alibi witnesses]" was unnecessary. Defendant testified:

> [T]he response that really . . . made him I believe not call my alibis, we watched the DVD of the eyewitness and she totally said somebody was at the crime other than me, said I was [5' 5"], dark skinned with a short haircut.
>
> I am [6' 2"], light skinned . . . at the time. He said that's obviously not you so you're going to . . . beat this case, you obviously didn't do this case and you don't need nobody to . . . come to court right now, you should beat the case.

Contrary to his certification, defendant admitted his attorney explained his reasons for not pursuing an alibi defense, namely, that counsel was going to "highlight [the eyewitness's] description of who the shooter was and how [defendant] in no way, shape or form matched that description."

On cross-examination, defendant testified he sent letters to his attorney's "boss," the trial judge, and "the ethics committee" during trial when his attorney did not call the witnesses as requested. Defendant stated the trial judge informed him all communications should be through trial counsel. Defendant

10

acknowledged he brought "issues . . . to the [c]ourt's attention," "filed [his] own motions," and "address[ed] with the [c]ourt [the] things [he was] unhappy about." Nonetheless, he never told the trial judge in open court "[he] ha[d] a problem" with his attorney "not doing what [he] want[ed] him to do," explaining he "never knew [he] could do that."

Defendant testified he was at the Econo Lodge motel "[o]n [Routes] 1 and 9" in Elizabeth on the night of the murder, about seven to eight blocks from the Lukoil gas station at the corner of "1 and 9" and "East Grand" where he used to sell drugs. He claimed he and his associates had "[a]t least three" rooms at the motel in May 2005. Defendant believed the murder happened "about . . . three blocks away from the gas station," which was "further away from the hotel." He testified he would sell drugs once he got up in the morning until around midnight, when "everything" in Elizabeth "shut down."

On May 9, 2024, the judge issued an order and comprehensive written decision denying defendant's petition. The judge detailed the facts gleaned from the evidentiary hearing, articulated the applicable legal principles, and made sound legal conclusions. He also explicitly incorporated by reference the findings from his 2020 order and opinion denying defendant's PCR petition as well as our opinion affirming in part and reversing in part said order.

11

Specifically, the judge found all three alibi witnesses lacked credibility. As for King, the judge found several discrepancies among King's affidavit, statement to Vogel, and testimony:

> [P]rior to his testimony he had not recalled the name of the motel being the Econo Lodge. Although his affidavit sets forth that "the place we sold drugs at shut down before [midnight]," he testified he was drug dealing with . . . defendant and their drug dealing happened at all hours of the day and night. He said he heard the shots at the time of the subject shooting[,] but he did not remember the exact day or week of the shooting[.] . . . [D]espite hearing the shots, and [d]efendant being with him at the hotel when he heard the shots, and knowing about [d]efendant being charged "in 2005," King never came forward. In contrast, neither his interview with Vogel or his affidavit mentioned that he heard the shots or that he learned of [d]efendant being charged with the murder in 2005. He also changed his testimony, at first testifying that he heard the shots when he was "on break" with [d]efendant at . . . [n]oon, but later he testified to say he was on break at . . . [m]idnight.
>
> [(Second alteration in original).]

Noting King could not have heard the gunshots from "inside the motel" as he claimed since the motel was "too far" from the scene, the judge found:

> King's recollection of new facts in his testimony caused him to present as less than credible. That one sequence of specific new facts . . . that he heard the shots, was with [d]efendant at the motel when he heard the shots and . . . first remember[ed] the name of the motel in his testimony[] significantly compromised his credibility.

12

That the record of all testimony from the other witnesses demonstrated that the Econo Lodge was a mile and a half from the shooting, which . . . King testified [h]e heard[,] was one of the most significant problems with King's testimony. . . . Moreover, King did not recall the names of any other persons at the motel.

The judge found similar problems with Cooke's testimony. The judge found suspect Cooke's claim that he remembered being with defendant "all of May [2005]" more than six years after the murder. In addition to the six-year time gap, the judge highlighted the following inconsistencies:

In subsequent testimony[, Cooke] recalled the name of the hotel as the Econo Lodge, but this was not in his affidavit. He testified that he did not know that a shooting had occurred when it happened, but that on the day of the shooting "we were drinking and smoking, getting high and fuzzy." He testified that[] among the "other individuals" who were with him and [d]efendant was King, but he did not mention Levine. His rejection of the accuracy of [Vogel's] report, specifically that ". . . Cooke believed at the time of the murder in Elizabeth . . . he and the others were in the county jail locked up on drug charges" was two-fold: [h]e contends that . . . [Vogel] reported inaccurately, and he also had trouble recalling specific dates when he actually was in jail in Elizabeth . . . well before the shooting. His interview with . . . [Vogel] was closer in time to the shooting, and . . . even he testified that his memory would have been sharper . . . closer to the shooting.

A-3316-23

The judge also noted Cooke did not speak to anyone about being an alibi witness at trial, "[d]espite seeing [d]efendant get arrested in 2009 and knowing the nature of the charges against [d]efendant, speaking to [d]efendant 'numerous times' [since he had been incarcerated,] and . . . [d]efendant [being] 'his big brother.'" The judge found the "circumstances present[ed] as troublingly difficult to find credible, especially when viewed [against] the backdrop of inconsistencies." The judge pointed to a litany of other factors that rendered the "strength and credibility" of Cooke's testimony "[t]enuous, at best." Specifically, the "date of the evening in question change[d] in [Cooke's] various accounts"; Cooke was admittedly "fuzzy" from "smoking drugs" on the night of the murder; and Cooke "had no idea when the shooting happened until after [d]efendant's trial was underway or over" despite his closeness to and consistent communication with defendant. Further, the judge noted Cooke's "voice change[d] as he testified to inaccuracies and additional facts beyond his interview and affidavit."

The judge concluded:

> Based on all of the foregoing, testimony, evidence, circumstances and the overall feel of the witness's demeanor, . . . the [c]ourt did not find Cook[e] credible as to being an alibi witness who could vouch for the innocence of [d]efendant. Moreover, that he considered [d]efendant a "close friend" and a "brother"

14

presents a bias that the [c]ourt finds also impacts and further diminishes his credibility.

Likewise, the judge found Levine unbelievable, describing him as "nervous" while testifying. Critically, Levine "did not know the date of the shooting in 2018" when interviewed by Vogel but included the date in his 2020 affidavit. The judge also found Levine's testimony that he left "'by Greyhound [bus] on Monday' the day after the shooting" inconsistent with the shooting occurring in the early morning hours of Monday. Additionally, the judge found it "difficult to believe" Levine would "not reach out to . . . [d]efendant's lawyer until 2016" since he and defendant were "close friends."

The judge concluded:

> That all events had to be reconstructed fifteen years later when [Levine] signed his affidavit, and when he signed his affidavit, he did not know the date of the shooting, which is the essential point of his testimony[,] . . . resonates dubious credibility to vouch for his "close friend" and "brother." Moreover, that he considered [d]efendant . . . [as such] presents a bias that the [c]ourt finds also impacts and further diminishes his credibility.

The judge explained each witness's testimony was "radically different" from the others' despite them all claiming to be with defendant "all day" on the day of the murder. Notably, King claimed to hear gunshots, Levine heard about

15

the shooting from someone at the motel, and Cooke did not learn of the shooting until years later. According to the judge:

> Beyond the need for reconstruction of the events of the date of the shooting years afterward, each was dealing and/or smoking drugs that day, as well as drinking and "hanging out" with his "business associates" and girls. Taken separately, . . . each [alibi witness] presented as not informed, conflicting, and in significant parts of their testimony defying fundamental common sense and logic.

The judge also rejected defendant's testimony about the handwritten letters as implausible. Specifically, the judge found they "lack[ed] veracity as to what [d]efendant purport[ed them] to be: . . . letter[s] he wrote and gave to his trial counsel in January or February before trial, which . . . purported to . . . request investigation of . . . King, Cook[e,] and Levine." Explicating his reasoning, the judge stated the letters were undated; were addressed to "Investigator" at the top of each page, which contradicted defendant's testimony they were written for his attorney; did not have contact information for King or Cooke; and did not provide a "substantive basis" for King or Cooke to be alibi witnesses, which made "no sense" given the alleged "significant," "exonerating" "facts to be learned from interviewing" them. Also, presuming Levine's testimony was true, it was "utterly unfathomable how or why [d]efendant could forget . . . to include Levine" in the witness lists.

16

The judge similarly found it implausible that defendant had "never mentioned his counsel[] . . . ignoring . . . alibi witnesses as a concern" at trial, despite being "afforded access and opportunity to address [the trial judge] with concerns or questions." Indeed, defendant "had inappropriately done so in letters" to the judge. Moreover, the judge found "[d]efendant's evasiveness and non-responsive answers undermined his contentions," especially since he "blunt[ly] recogni[zed] that his attorney always discussed his trial strategy that targeted the eyewitness and provided confident reassurance that [pursuing] this strategy" was in defendant's best interests. Accordingly, the judge determined defendant's "credibility [was] significantly compromised as to his discussions with trial counsel" about investigating and calling the alibi witnesses.

The judge determined defendant failed to establish either prong of the Strickland/Fritz[4] test. As to the first prong, the judge found defendant's attorney made the "strategic decision to focus on the eyewitness and to not call [a]libi [w]itnesses, which . . . would have presented a conflicting defense theory." As to the second prong, the judge found defendant "failed to demonstrate a reasonable probability that the result of the [trial] would have been different if

---

[4] Strickland v. Washington, 466 U.S. 668 (1984); State v. Fritz, 105 N.J. 42 (1987).

King, Cook[e,] and Levine had testified at trial," given that they were "plainly incredible and conflict[ed]" with one another. The judge also cited the strength of the State's case in analyzing the prejudice prong. This appeal followed.

II.

In State v. Pierre, 223 N.J. 560 (2015), our Supreme Court established the standard of review in PCR cases where the PCR court holds an evidentiary hearing:

> In reviewing a PCR court's factual findings based on live testimony, an appellate court applies a deferential standard; it "will uphold the PCR court's findings that are supported by sufficient credible evidence in the record." Indeed, "[a]n appellate court's reading of a cold record is a pale substitute for a trial judge's assessment of the credibility of a witness he [or she] has observed firsthand." However, a "PCR court's interpretation of the law" is afforded no deference, and is "reviewed de novo." "[F]or mixed questions of law and fact, [an appellate court] give[s] deference . . . to the supported factual findings of the trial court, but review[s] de novo the lower court's application of any legal rules to such factual findings."
>
> [Id. at 576-77 (second, third, and fourth alteration added) (omission in original) (citations omitted).]

To reverse a conviction based on IAC, a defendant must demonstrate "by a preponderance of the credible evidence" that the performance of defendant's attorney fell below the objective standard of reasonableness set forth in

18

Strickland, 466 U.S. at 687-88, and adopted in Fritz, 105 N.J. at 49-58, and that the outcome would have been different without the purported deficient performance. State v. Echols, 199 N.J. 344, 357-59 (2009). Stated differently, a defendant must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687; Fritz, 105 N.J. at 58.

To satisfy the first prong, a defendant must "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment" and "that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88. "Judicial scrutiny of counsel's performance must be highly deferential," and a defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). As such, "[i]f counsel thoroughly investigates law and facts, considering all possible options, his or her trial strategy is 'virtually unchalleng[e]able.'" State v. Savage, 120 N.J. 594, 617 (1990) (quoting Strickland, 466 U.S. at 690-91).

On the other hand, IAC may be established "when counsel fails to conduct an adequate pre-trial investigation." Porter, 216 N.J. at 352. "[C]ounsel has a

duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691.

In particular, "[f]ailure to investigate an alibi defense is a serious deficiency that can result in the reversal of a conviction." Porter, 216 N.J. at 353; see also Pierre, 223 N.J. at 582-88 (holding that counsel's presentation of an alibi defense was deficient and prejudicial because he failed to interview known, key witnesses who could have bolstered that defense and "chose to forego evidence that could have reinforced that alibi," entitling the defendant to a new trial). Indeed, "few defenses have greater potential for creating a reasonable doubt as to [a] defendant's guilt in the minds of the jury [than an alibi]." State v. Mitchell, 149 N.J. Super. 259, 262 (App. Div. 1977).

However, "[d]etermining which witnesses to call to the stand is one of the most difficult strategic decisions any trial attorney must confront." State v. Arthur, 184 N.J. 307, 320 (2005). "[L]ike other aspects of trial representation, a defense attorney's decision concerning which witnesses to call to the stand is 'an art,' and a court's review of such a decision should be 'highly deferential.'"

Id. at 321 (citation omitted) (quoting Strickland, 466 U.S. at 689, 693). When "considering the impact of the absent witness," a court should evaluate: "(1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution." State v. L.A., 433 N.J. Super 1, 16-17 (App. Div. 2013) (quoting McCauley-Bey v. Delo, 97 F.3d 1104, 1106 (8th Cir. 1996)).

To satisfy the prejudice prong of an IAC claim, "[t]he error committed must be so serious as to undermine the court's confidence in the jury's verdict or result reached." State v. Chew, 179 N.J. 186, 204 (2004) (citing Strickland, 466 U.S. at 694). This prong generally requires that a defendant establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Failure to meet either prong of the two-pronged Strickland/Fritz test results in the denial of a petition for PCR. State v. Parker, 212 N.J. 269, 280 (2012) (citing Echols, 199 N.J. at 358). That said, "courts are permitted leeway to choose to examine first whether a defendant has been prejudiced, and if not, to dismiss the claim without determining whether counsel's performance was constitutionally

deficient." State v. Gaitan, 209 N.J. 339, 350 (2012) (citation omitted) (citing Strickland, 466 U.S. at 697).

Applying these principles, we agree with the judge defendant failed to establish an IAC claim under the Strickland/Fritz standard. The judge's factual findings, which are entitled to our deference, are supported by sufficient credible evidence in the record and the judge's legal conclusions are sound.

Defendant argues the judge's credibility findings as to King, Cooke, Levine, and defendant were "'clearly mistaken' and 'so wide of the mark' that the 'interests of justice require'" reversal. In particular, defendant argues the witnesses' "differing abilities to remember all the people they were with" at the hotel and that "only . . . King[] heard gunshots" were insufficient grounds to discredit the witnesses given how long ago the shooting occurred. Defendant further asserts the judge should not have "blamed the men" for "waiting so long" to submit affidavits since it was "out of their control." Defendant adds that "nothing" in his testimony "lack[ed] veracity" as he merely testified to the undisputed fact that his attorney refused to investigate his alibi defense.

We reject defendant's invitation to make credibility determinations de novo. When an IAC claim is premised on counsel's failure to call a witness, one important factor a judge must "consider . . . [is] the credibility of all witnesses,

22

including the likely impeachment of the uncalled defense witnesses." L.A., 433 N.J. Super. at 16-17 (quoting McCauley-Bey, 97 F.3d at 1106). We defer to the credibility determinations made by the judge based on his opportunity to observe the witnesses. State v. Nash, 212 N.J. 518, 540 (2013).

"[A]pplying a heavy measure of deference to counsel's judgments," defendant failed to meet the first Strickland/Fritz prong because he has not shown it was unreasonable for his attorney not to investigate or present the alibi witnesses to the jury. Strickland, 466 U.S. at 691. Indeed, under the circumstances, trial counsel's strategic decision to challenge the eyewitness identification was unassailable. Presenting the alibi witnesses' conflicting accounts and exposing them to cross-examination risked losing credibility with the jury. That the theory defense counsel chose to pursue failed does not alone establish IAC. State v. Bey, 161 N.J. 233, 251 (1999) ("Merely because a trial strategy fails does not mean that counsel was ineffective.").

Even if counsel's performance was deficient, defendant failed to meet the second Strickland/Fritz prong because he has not shown a reasonable probability that but for the deficiency, the jury would have acquitted him. Given the State's proofs, it is clear the incredulous testimony of the alibi witnesses would not have changed the outcome. Despite each witness's claim to have been at the motel

with defendant at the time of the shooting, each witness presented different facts about the day's events, each witness learned about the shooting in a different manner, and each witness was biased in defendant's favor. On the other hand, the jury clearly credited the version of events offered by the State's witnesses at trial, which established defendant's motive and identified him as the shooter.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

24